# United States District Court
for the
Western District of New York

| | |
|---|---|
| United States of America<br>v.<br>**TIMOTHY SIVERD**<br>*Defendant* | Case No. 22-MJ-689 |

## CRIMINAL COMPLAINT

I, **Scott M. Kendall**, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on or before November 1, 2021, through on or about April 14, 2022, in the Western District of New York, the defendant, TIMOTHY SIVERD, violated Title 18, United States Code, Sections 1343 (Wire Fraud) and 1956 and 1957 (Money Laundering), offenses further described as follows:

The defendant did knowingly devise and execute a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent representations, with specific intent to defraud, and in execution of that scheme, used or caused the use of interstate wires, in violation of Title 18, United States Code, Section 1343;

The defendant conducted financial transactions involving property constituting the proceeds of specified unlawful activity—specifically wire fraud—all while knowing that the property involved in the financial transactions was the proceeds of some form of unlawful activities and with the intent to promote the carrying on of said specified unlawful activities, in violation of Title 18, United States Code, Sections 1956; and

The defendant knowingly engaged in monetary transactions in or affecting interstate commerce, each with a value greater than $10,000, which transactions occurred in the United States and involved property derived from a specified unlawfully activity—specifically wire fraud—all while knowing that the property was derived from said specified unlawful activities, in violation of Title 18, United States Code, Section 1957.

This Criminal Complaint is based on these facts:

SEE ATTACHED AFFIDAVIT OF HSI SPECIAL AGENT SCOTT M. KENDALL

☒ Continued on the attached sheet.

*Complainant's signature*

SCOTT M. KENDALL, Special Agent, HSI
*Printed name and title*

Submitted electronically by email in .pdf format. Oath administered, and contents and signature, attested to me as true and accurate telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3).

Date: October 06, 2022

*Judge's signature*

City and State: Rochester, New York

HON. MARK W. PEDERSEN
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**

STATE OF NEW YORK   )
COUNTY OF MONROE   )   ss:
CITY OF ROCHESTER   )

I, SCOTT M. KENDALL, being duly sworn, depose and states:

1. I am a Special Agent (SA) with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI), and have been so employed since March 2021. My responsibilities include investigating violations of federal criminal laws, including crimes involving smuggling, narcotics trafficking, and money laundering. As such, I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516, and Title 21 of the United States Code.

2. As part of my employment as an HSI Special Agent, I have participated in the execution of search and arrest warrants, conducted surveillance, reviewed financial records, served subpoenas, and carried out other investigative duties. I received a Bachelor's degree in Finance from the Canisius College of Buffalo, where I took numerous classes in finance and accounting. I was previously employed as an accounting assistant as well as a loan processor at a financial institution. I received training in financial investigations and constitutional law throughout approximately twenty-seven weeks of training in the Criminal Investigator Training Program and HSI Special Agent Training academy at the Federal Law Enforcement Training Center in Glynco, Georgia. Through my training and experience, I have become familiar with

1

the ways in which money is illegally or fraudulently obtained and laundered to avoid detection by law enforcement.

3. This affidavit is submitted in support of a criminal complaint charging Timothy SIVERD with violations of Title 18, United States Code, Sections 1343 (Wire Fraud) and Title 18, United States Code, Sections 1956 and 1957 (Money Laundering) (hereinafter, collectively the "TARGET OFFENSES").

4. As more fully described below, the facts set forth in this Affidavit are based on my personal knowledge, information that I have learned from witnesses, records, documents obtained from both law enforcement and publicly available sources, and conversations with other experienced law enforcement officers, including taskforce officers from the Greater Rochester Area Narcotics Enforcement Team (GRANET), deputies and investigators from the Monroe County Sheriff's Office (MCSO), and other HSI Special Agents.

5. Because this Affidavit is being submitted for the limited purpose of establishing probable cause to secure a Criminal Complaint, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only those facts that relate to the issue of whether probable cause exists to believe that evidence, contraband, fruits, and instrumentalities of the TARGET OFFENSES are presently located within the SUBJECT PREMISES.

6. Unless otherwise indicated, conversations discussed herein are described in sum and substance rather than verbatim.

## INVESTIGATION BACKGROUND

7. SIVERD first came to the attention of law enforcement on or around December 16, 2021, when he was surveilled meeting with the target of another investigation involving the receipt and sale of stolen goods in interstate commerce, Tony Orlando CAMACHO. On that date, SIVERD was observed engaging in a hand-to-hand exchange of an unknown nature with CAMACHO.

8. Investigators conducted checks on SIVERD using both restricted and open-source databases and found that SIVERD received a Bachelor of Science degree in Finance from Syracuse University and a Master's degree in Business Administration from the University of Rochester, was employed as a vice president of commercial banking at Tompkins Community Bank, and was previously employed by M&T Bank and Ernst & Young.

9. During the prior investigation, I reviewed CAMACHO's bank records and observed five transactions in which SIVERD transferred substantial sums to CAMACHO. CAMACHO subsequently made structured withdrawals of the funds. These transactions are summarized in the below table:

| Anthony CAMACHO ESL Checking Account x4767 | | |
|---|---|---|
| Date | Amount | Transaction |
| 2/9/2022 | $40,000.00 | Cashier's check from SIVERD, $31,000 deposited and $9,000 taken in cash |
| 2/16/2022 | $9,900.00 | Withdrawal |
| 2/17/2022 | $9,980.00 | Withdrawal |
| 2/22/2022 | $600.00 | Withdrawal |
| 2/22/2022 | $600.00 | Withdrawal |
| 2/22/2022 | $9,950.00 | Withdrawal |
| 2/23/2022 | $6,000.00 | Withdrawal |
| 2/23/2022 | $45,000.00 | Deposit via transfer from SIVERD ESL checking account x0297 |
| 2/26/2022 | $500.00 | Withdrawal |

| | | |
|---|---|---|
| 2/28/2022 | $9,980.00 | Withdrawal |
| 3/1/2022 | $9,980.00 | Withdrawal |
| 3/3/2022 | $9,980.00 | Withdrawal |
| 3/4/2022 | $9,980.00 | Withdrawal |
| 3/5/2022 | $9,980.00 | Withdrawal |
| 3/9/2022 | $9,980.00 | Withdrawal |
| 3/11/2022 | $9,980.00 | Withdrawal |
| 3/12/2022 | $9,980.00 | Withdrawal |
| 3/14/2022 | $43,000.00 | Deposit via transfer from SIVERD ESL checking account x0297 |
| 3/14/2022 | $2,400.00 | Deposit via transfer from SIVERD ESL checking account x0297 |
| 3/15/2022 | $9,980.00 | Withdrawal |
| 3/16/2022 | $9,980.00 | Withdrawal |
| 3/18/2022 | $9,980.00 | Withdrawal |
| 3/19/2022 | $9,980.00 | Withdrawal |
| 3/21/2022 | $9,980.00 | Withdrawal |
| 3/23/2022 | $9,980.00 | Withdrawal |
| 3/24/2022 | $56,800.00 | Deposit via transfer from SIVERD ESL checking account x0297 |
| 3/24/2022 | $9,980.00 | Withdrawal |
| 3/25/2022 | $9,980.00 | Withdrawal |
| 3/26/2022 | $9,980.00 | Withdrawal |
| 3/28/2022 | $9,980.00 | Withdrawal |
| 3/28/2022 | $25,000.00 | Transfer to CAMACHO ESL Savings Account x4759 |
| 3/30/2022 | $9,980.00 | Withdrawal |
| 3/31/2022 | $600.00 | Withdrawal |
| 4/1/2022 | $9,980.00 | Withdrawal from CAMACHO ESL Savings Account x4759 |
| 4/4/2022 | $600.00 | Withdrawal |
| 4/5/2022 | $9,980.00 | Withdrawal from CAMACHO ESL Savings Account x4759 |
| 4/11/2022 | $9,980.00 | Withdrawal |
| 4/14/2022 | $5,000.00 | Transfer from CAMACHO ESL Savings Account x4759 |
| 4/14/2022 | $8,000.00 | Withdrawal |

10. In total, between on or about February 9, 2022, and on or about March 24, 2022, SIVERD transferred $187,200.00 to CAMACHO and CAMACHO withdrew the full amount from his accounts within days of each transfer in amounts just under $10,000.

11. According to documents obtained from Verizon Wireless, on each of the four days that SIVERD transferred money to CAMACHO, SIVERD and CAMACHO contacted each

4

other *via* cell phone.

12.     Due to the suspicious nature of these transactions, I initiated an investigation into SIVERD. The results of that investigation are set forth below.

## PROBABLE CAUSE

13.     On or about July 26, 2022, I interviewed Victim 1. On or about July 29, 2022, I interviewed Victim 2. According to both Victims, they met SIVERD approximately 15 years ago at Syracuse University. The three were fraternity brothers and housemates during college. SIVERD remained a close friend to both Victim 1 and Victim 2 after college. In fact, SIVERD is the godfather of Victim 2's child.

14.     In or around November 2021, SIVERD was a vice president at Tompkins Community Bank.

*Victim 1*

*Transaction #1*

15.     According to Victim 1, he and SIVERD had often discussed building a portfolio of real estate investments together.

16.     In or around November 2021, SIVERD approached Victim 1 with an opportunity to start building their joint real estate portfolio by investing in a group of four residential duplexes located in Rochester, New York.

17.     Once SIVERD and Victim 1 selected a set of four duplexes that they agreed to purchase, Victim 1 made an initial down payment, on or about November 12, 2021, by paying

5

$12,500.00 into SIVERD's ESL Checking Account X0297.

18. According to ESL's records, that same day, SIVERD withdrew $10,750 of Victim 1's funds from ESL Checking Account X0297 in cash.

19. On or about November 22, 2021, Victim 1 made a second deposit of $12,500 into J.P. Morgan Chase ("JPMC") Checking Account X6508, which belonged to SIVERD and his wife, Brenna McQueen.

20. The following day, on or about November 23, 2021, SIVERD made a cash withdrawal of $12,200 from the JPMC account X6508.

21. In or around December 2021, SIVERD contacted Victim 1 and stated that this real estate investment had been called off, purportedly due to a mold issue.

22. Victim 1 requested his investment of $25,000 be returned to him, but SIVERD instead came forward with another proposed real estate transaction.

*Transaction #2 – Tompkins Line of Credit*

23. In or around December 2021, SIVERD represented to Victim 1 that he was getting a higher-than-average rate of return in a savings account he maintained at Tompkins, the bank where SIVERD was employed.

24. SIVERD invited Victim 1 to open a similar investment account.

25. On or about December 6, 2021, Victim 1 transferred $10,000 to SIVERD's ESL Account x0297. Victim 1 believed that this payment was going to be used by SIVERD to open an investment account at Tompkins Bank of Castile on Victim 1's behalf.

26. However, that same day, SIVERD withdrew the full $10,000 in cash. When the opening of the account was brought up again several weeks later, SIVERD informed Victim 1 that he had used the $10,000 to pay down his own line of credit at Tompkins Bank rather than invest it on Victim 1's behalf as agreed upon.

*Transaction #3 - The Carriages at Cedar Rock*

27. Also in or around December 2021, SIVERD told Victim 1 that he had an acquaintance named "P.S." who was consulting for Canandaigua National Bank ("CNB") and therefore was able to purchase foreclosed properties from CNB at below market prices.

28. SIVERD specifically represented to Victim 1 that CNB owned a complex of townhomes located at 722-733 Cedar Rock Road in Webster, New York, known as "The Carriages at Cedar Rock" (hereinafter "The Carriages") and that CNB wanted to sell the Carriages to "P.S." before the end of 2021.

29. Contrary to what SIVERD represented to Victim 1, CNB never owned The Carriages. According to the Monroe County Clerk's records, as of July 2021 the Deed for the property was held by LC PROPCO 3 LLC. Also according to County records, CNB did at one time grant a mortgage and building loan to the original builder of The Carriages, but the Notices of Lending made by CNB and the builder were both terminated in 2015, and there was never a foreclosure on the property as purported by SIVERD.

30. SIVERD proposed that "P.S.," SIVERD, and Victim 1 form a limited liability company—Sumner Capital, LLC—to purchase The Carriages. "P.S." would own half of Sumner Capital, LLC. SIVERD and Victim 1 would each own a quarter of Sumner Capital, LLC.

31. SIVERD represented to Victim 1 that CNB required an immediate deposit of $150,000. SIVERD said that he would apply Victim 1's prior payments totaling $25,000 towards the deposit and asked Victim 1 to send an additional $25,000 as soon as possible. SIVERD represented that he would use his line of credit with Tompkins to pay the remainder of the deposit.

32. On or about December 15, 2021, Victim 1 paid $25,000 into SIVERD's ESL Account X0297. That same day, SIVERD withdrew $24,975 from ESL Account X0297 in four separate transactions: a $10,000 cash withdrawal; a $5,000 cash withdrawal; a $9,500 cashier's check to his wife, Brenna McQueen; and a $475 internet transfer to another ESL account. SIVERD did not transfer Victim 1's deposit to an escrow account or to CNB.

33. SIVERD further represented to Victim 1 that Tompkins (where SIVERD was then employed as a Vice President) agreed to loan them the funds necessary to complete the purchase of The Carriages.

34. SIVERD presented Victim 1 with a loan commitment letter, dated January 9, 2022, on Tompkins Community Bank letterhead. The commitment letter indicated that Tompkins had approved a loan for 85% of the appraised value of The Carriages property. The alleged loan was contingent upon Tompkins Community Bank receiving a $22,500 commitment fee, which was due upon acceptance of the commitment letter.

35. The loan commitment letter appeared to be signed by "S.P.", Senior Vice President, The Bank of Castile. However, during this investigation, an MCSO investigator interviewed S.P., who indicated that the letter was not genuine and that his signature on the letter was forged.

36. The loan commitment letter was countersigned by SIVERD, Victim 1, and "P.S."

37. Victim 1 agreed to pay approximately half of the loan commitment fee and, on or about January 3, 2022, Victim 1 wired $12,500 to SIVERD'S ESL Account X0297. SIVERD withdrew $12,300 in cash from his account that same day.

38. SIVERD also presented Victim 1 with a Real Estate Purchase Contract for The Carriages transaction.

39. The Purchase Contract indicated that CNB would sell The Carriages to Sumner Capital, LLC, for a purchase price of $2,550,000. The scheduled closing date was March 1, 2022.

40. The Purchase Contract purported to be signed by "C.V." on behalf of CNB. The Purchase Contract also appeared to have been signed by SIVERD and "P.S."

41. On or about January 18, 2022, Victim 1 executed the Purchase Contract.

42. At some point while the transaction was still being negotiated, SIVERD represented to Victim 1 that there was a mechanic's lien on The Carriages that needed to be paid before the transaction could close.

43. On or about January 19, 2022, Victim 1 paid $10,929 to SIVERD's ESL Account X0297. SIVERD immediately withdrew the funds, performing a withdrawal of $10,500 as well as initiated a transfer in the amount of $425 to his Robinhood investment account.

*Transaction #4 – Keuka Lake House*

44. Around this time, SIVERD also represented to Victim 1 that he was able to purchase a property on Keuka Lake.

45. Victim 1 agreed to purchase the lake house with SIVERD and, on or about February 9, 2022, Victim 1 wired $40,000 to SIVERD's ESL Account X0297.

46. That same day, SIVERD issued a $40,000 cashier's check from his ESL Account X0297 payable to CAMACHO. As shown in the chart at Paragraph 9, above, on February 9, 2022, CAMACHO deposited the $40,000 check into his ESL Account x4767 and, between February 16 and February 23, CAMACHO made structured withdrawals of the funds in amounts just under $10,000.

*Transaction #5 – Creek Crossing*

47. While the purchase of "The Carriages" was still pending, in or around January 2022, SIVERD approached Victim 1 with another investment opportunity.

48. SIVERD represented to Victim 1 that Tompkins owned a townhouse development located at 2A Marple Lane in Hilton, New York, which was known as "Creek Crossing Townhomes" (hereinafter "Creek Crossing").

49. Contrary to what SIVERD represented to Victim 1, Tompkins never owned Creek Crossing. According to records maintained by the Monroe County Clerk's Office, it has been owned by Howitt-Hilton LLC since December of 2005.

50. Around this time, SIVERD told Victim 1 that "P.S." had been diagnosed with cancer and no longer wanted to proceed with The Carriages transaction.

51. SIVERD and Victim 1 agreed to proceed with The Carriages and Creek Crossings transactions as partners through a newly-formed limited liability company—Sumner Capital II, LLC.

52. On or about January 27, 2022, SIVERD provided Victim 1 with a Real Estate Purchase Agreement in which "Tompkins Financial Corporation" agreed to sell Creek Crossing to Sumner Capital II, LLC, for a total price of $1,999,000. The Purchase Agreement further indicated that the buyer, Sumner Capital II, LLC (*i.e.*, SIVERD and Victim 1) owed a down payment of $70,000 upon execution of the Purchase Agreement. The down payment was supposed to be held by an escrow agent, First American Title Insurance Company.

53. The Purchase Agreement appeared to be signed by "T.S." on behalf of "Tompkins Financial Corporation."

54. On or about January 27, 2022, SIVERD and Victim 1 counter-signed the Purchase Agreement.

55. Upon signing the Purchase Agreement, Victim 1 wired half of the required down payment ($35,000) to SIVERD's ESL Account X0297.

56. In return, SIVERD sent Victim 1 a Receipt that purported to acknowledge First American Title Insurance Company's receipt of the full $70,000 down payment. The receipt appeared to be signed by "J.K." on behalf of First American Title Insurance Company. An MCSO investigator interviewed employees of First American Title Insurance Company and found that there was no record of this transaction occurring, and that the document appeared to be fraudulent.

57. The same day he received the $35,000 wire from Victim 1, SIVERD made a series of withdrawals from the ESL Account X0297 totaling $34,750: a cash withdrawal of $9,000; a cashier's check to CAMACHO for $16,000; and a wire transfer of $9,750 to the JPMorgan Chase Bank account he shares with his wife, Brenna McQueen.

58. On or about March 3, 2022, SIVERD sent Victim 1 documents that purported to show that SIVERD had registered Sumner Capital I, LLC, as a limited liability company in New York State. These documents were fraudulent; according to New York State's records, there has never been a company named Sumner Capital I, LLC registered to do business in New York.

59. To fund the remainder of the combined transactions, SIVERD presented Victim 1 with a revised loan commitment letter from Tompkins Community Bank, in which Tompkins agreed to loan SIVERD and Victim 1 85% of the appraised value of The Carriages and Creek Crossing.

60. Once again, "S.P."'s signature was forged on the loan commitment letter. SIVERD and Victim 1 both counter-signed the loan commitment letter on or about March 10, 2022.

61. On or about April 11, 2022, SIVERD sent Victim 1 a draft revised Real Estate Purchase Contract.

62. In total, Victim 1 paid SIVERD approximately $158,429, believing that SIVERD was investing all these funds in various real estate transactions.

63. Eventually, Victim 1 realized that all the above-listed transactions were fraudulent. On or about April 14, 2022, Victim 1 sent SIVERD a demand for repayment of the money Victim 1 believed he had invested in the Carriages and Creek Crossings transactions.

64. SIVERD subsequently returned $108,429 of Victim 1's funds (using funds SIVERD fraudulently obtained from Victim 2, as set forth in further detail below).

*Victim 2*

65. At the same time that SIVERD was struggling to return Victim 1's funds, in or around March 2022, SIVERD approached Victim 2 with a series of investment opportunities.

*Transaction #6 – Greenwood Townhomes*

66. The first transaction involved a townhouse complex located at 31 Mulcahy Blvd, Phase I in Rochester, New York, known as "Greenwood Townhomes."

67. SIVERD represented to Victim 2 that "P.S."[1] owned "Greenwood Townhomes" but "P.S." was dying of cancer and looking to sell his assets.

68. Contrary to SIVERD's representations, according to the Monroe County Clerk's records, P.S. never owned Greenwood Townhomes. Rather, the property has been owned by Howitt-Paul Road LLC since May 2009.

69. SIVERD proposed that he and Victim 2 form a limited liability company named Sumner Capital, LLC, and use that entity to purchase Greenwood Townhomes. SIVERD would own half of Sumner Capital, LLC, and Victim 2 would own the other half.

70. During March 2022, SIVERD and Victim 2 exchanged a number of financial analyses of the proposed Greenwood Townhomes transaction.

71. On or about February 23, 2022, Victim 2 paid $50,000 to SIVERD's ESL Account X0297. That same day, SIVERD transferred $45,000 of Victim 2's funds to CAMACHO's ESL Account x4767. Days later, SIVERD transferred $4,500 to his own Robinhood investment

---

[1] SIVERD named the same "P.S." that he had previously discussed with Victim 1.

13

account.

72. As is shown in the chart at Paragraph 9, above, on February 23, 2022, CAMACHO deposited the $45,000 into his ESL account and, between February 26 and March 12, made structured withdrawals of the funds in amounts just under $10,000.

73. On or about March 15, 2022, SIVERD and Victim 2 executed a Promissory Note to memorialize Victim 2's payment of $50,000 to SIVERD "to make an investment into the acquisition of Greenwood Townhomes."

74. On or about March 16, 2022, Victim 2 wrote SIVERD a check for $6,226.55. SIVERD represented to Victim 2 that these funds would be used to pay the closing costs associated with the Greenwood Townhomes transaction.

75. Instead, on or about March 21, 2022, SIVERD deposited the $6,226.55 check from Victim 2 into SIVERD's JPMC Account X6508.

76. On or about March 24, 2022, Victim 2 paid another $77,500 towards the purchase of Greenwood Townhomes to SIVERD's ESL Account X0297. That day, SIVERD withdrew the entire payment from his ESL account in four separate transactions: a $56,800 transfer to CAMACHO; a $6,500 transfer to SIVERD's mother; a $2,000 transfer to SIVERD's Robinhood Account; and a $12,185 transfer to an E*TRADE brokerage account.

77. As is shown in the chart at Paragraph 9, above, on March 24, 2022, CAMACHO's ESL Account x4767 received the $56,800 transfer of Victim 2's funds. Between March 24 and March 28, CAMACHO made four structured, $9,800 withdrawals of the funds. And, on March 28, 2022, CAMACHO transferred the remaining $25,000 of Victim 2's funds to his savings

account. Subsequently, on April 1, April 5, and April 14, CAMACHO made three additional, structured withdrawals of $9,800, $9,800, and $5,000, respectively, from that savings account.

78. On or about April 1, 2022, Victim 2 made a fourth payment towards the Greenwood Townhomes purchase by wiring $32,715 to SIVERD's JPMC Account X6508. Over the following weeks, SIVERD spent Victim 2's money on various personal transactions at gas stations, grocery stores, and other assorted retailers. SIVERD also used Victim 2's money to engage in online gambling.

79. On or about April 4, 2022, SIVERD sent Victim 2 an operating agreement for Sumner Capital, LLC.

80. On or about April 4, 2022, Victim 2 made a fifth and final payment toward the Greenwood Townhomes transaction of $2,750. SIVERD represented that these funds were for attorneys' fees.

81. Instead, SIVERD deposited Victim 2's check into SIVERD's JPMC Account X6508 and spent the funds on personal expenses and online gambling.

*Transaction #7 – Company LC*

82. The second transaction involved an investment in COMPANY LC.

83. SIVERD represented to Victim 2 that he and several other investors were forming Turkey Ridge Capital Partners LLC to purchase shares of a company ("Company LC").

84. SIVERD provided Victim 2 with a draft Operating Agreement for Turkey Ridge Capital Partners LLC.

85. The draft Operating Agreement indicated that the purpose of Turkey Ridge Capital Partners LLC was "solely to hold a membership interest in [Company LC]."

86. The draft Operating Agreement indicated that Turkey Ridge Capital Partners LLC would have 16 members and that each member would make an initial capital commitment.

87. SIVERD specifically indicated that he would make capital commitments of $50,000 on his own behalf, $33,333.33 on behalf of his two children, and $16,667 on behalf of Victim 2's son.

88. Victim 2 was scheduled to make a capital contribution of $50,000.

89. SIVERD also provided Victim 2 with confidential offering materials prepared by Company LC, a Subscription Agreement for the purchase of units of Company LC for $50,000 per unit, and a deal deck that was prepared by Company LC to promote the offering.

90. On or about March 14, 2022, Victim 2 transferred $52,200 into SIVERD's ESL Checking Account x0297.

91. On or about March 15, 2022, SIVERD and Victim 2 executed a second Promissory Note to memorialize Victim 2's payment to SIVERD of $52,500 to "make an investment into the acquisition of [Company LC]."

92. Instead of investing Victim 2's money in a financial transaction, SIVERD again immediately transferred the funds to CAMACHO's ESL Account x4767. As is shown in the chart at Paragraph 9, above, on March 14, 2022, CAMACHO's ESL Account X4767 received a $43,000 transfer and a $2,400 transfer of Victim 2's funds. Between March 15 and March 23, CAMACHO withdrew the funds in a series of structured cash withdrawals of just under $10,000.

*Transaction #8 - Personal Loan*

93. In March 2022, SIVERD represented to Victim 2 that he had cash flow troubles and asked Victim 2 for a short-term loan.

94. Victim 2 agreed to loan SIVERD $25,000.

95. On or about March 31, 2022, Victim 2 sent SIVERD a promissory note memorializing the terms of the personal loan. The note required SIVERD to repay the $25,000 within 30 days.

96. On or about April 4, 2022, SIVERD deposited a $25,000 check from Victim 2 into his JPMC Account X6508.

97. SIVERD never repaid Victim 2 for the personal loan.

*Transaction #7 – Dunwood Green Apartments*

98. On or around April 14, 2022, Victim 2 mailed a check for $100,000 to SIVERD for an investment into Dunwood Green Apartments and on or around April 18, 2022, the $100,000 check was deposited into SIVERD's JPMC Account X6508. SIVERD then spent this money on personal expenses, online gambling, the purchase of a golf simulator, a $25,000 wire partial repayment to Victim 1, and a $60,000 withdrawal.

99. In total, Victim 2 paid SIVERD $346,511.55 believing that these funds would be invested in various real estate and financial transactions. SIVERD never returned any of Victim 2's funds.

## CONCLUSION

100. Based on the forgoing, the undersigned respectfully submits that there is probable cause to believe that SIVERD knowingly committed the TARGET OFFENSES.

101. I further request that the Court issue an order of sealing and non-disclosure for all papers in support of this application, including the affidavit and Criminal Complaint. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Premature disclosure may seriously jeopardize the investigation by giving the targets an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee from prosecution. Accordingly, I request that the Court order that the criminal complaint, this affidavit, the application for an arrest warrant, and all attachments thereto be filed under seal for 90 days or until further order of this Court, and that the service provider not disclose the existence of these documents for the same period.

_____
SCOTT M. KENDALL
Special Agent
Homeland Security Investigations

Affidavit submitted electronically by email in .pdf format. Oath administered, and contents and signature, attested to me as true and accurate telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on this 6th day of October 2022.

_____
HON. MARK W. PEDERSEN
UNITED STATES MAGISTRATE JUDGE